Don Springmeyer, Esq.
Nevada State Bar No. 1021
Justin C. Jones, Esq.
Nevada State Bar No. 8519
Bradley Schrager, Esq.
Nevada State Bar No. 10217
**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
3556 E. Russell Road, 2nd Floor
Las Vegas, Nevada 89120-2234
Telephone: (702) 341-5200/Fax: (702) 341-5300
Email: dspringmeyer@wrslawyers.com
Email: jjones@wrslawyers.com
Email: bschrager@wrslawyers.com
*Attorneys for Plaintiffs and Interim Class Counsel (additional counsel*
*listed in signature block)*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| BROOKE CARDOZA, *et al.*, all on behalf of themselves and all similarly-situated individuals,<br><br>         Plaintiffs,<br><br>    vs.<br><br>BLOOMIN' BRANDS, INC., a Delaware Corporation; OSI RESTAURANT PARTNERS, LLC, a Florida Limited Liability Company; OUTBACK STEAKHOUSE OF FLORIDA, LLC, a Florida Limited Liability Company; OS RESTAURANT SERVICES, LLC, a Florida Limited Liability Company; and DOES 5 through 100, Inclusive,<br><br>         Defendants. | **CASE NO.:  2:13-cv-01820-JAD-NJK**<br><br><br>**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF FLSA CLASS SETTLEMENT** |

COME NOW the above-captioned Plaintiffs, by and through Class Counsel, and move this Court for an Order granting Plaintiffs' Motion for Final Approval of Settlement, and for other relief as described herein.

This Motion is based on the Memorandum of Points and Authorities below, all papers and exhibits on file herein, and any oral argument this Court sees fit to allow at hearing on this matter.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.      INTRODUCTION

Plaintiffs Brooke Cardoza, *et al.* ("Plaintiffs"), and Defendants Bloomin' Brands, Inc., a Delaware Corporation; OSI Restaurant Partners, LLC, a Florida Limited Liability Company; Outback Steakhouse of Florida, LLC, a Florida Limited Liability Company; and OS Restaurant Services, LLC (collectively, "Defendants") previously reached a settlement of the above-captioned wage-and-hour class action.  On April 19, 2016, the Court granted preliminary approval of the settlement and approved the notice to be sent to Class Members. ECF No. 430. Having completed the notice procedure approved by the Court, the parties now seek final approval of settlement. As previously articulated for the Court in their Motion for Preliminary Approval, Class Counsel believe that the proposed final settlement is fair and adequately compensates the members of the class for the alleged off-the-clock work that they performed.

## II.     FACTUAL BACKGROUND

Plaintiffs commenced this lawsuit (the "Lawsuit" or "Action") by filing, on October 4, 2013, a complaint against Defendants in *Cardoza v. Bloomin' Brands, Inc.*, Case No. 2:13-cv-01820-JAC-(NJK), in the United States District Court for the District of Nevada, asserting a claim for violation of the Fair Labor Standards Act ("FLSA").  ECF No. 1.  Plaintiffs filed a First Amended Complaint on December 24, 2013, adding twelve (12) additional named Plaintiffs and adding claims under the Nevada Wage and Hour Law, the Illinois Wage Payment and Collection Act, the Illinois Minimum Wage Act, the Maryland Wage Payment and Collection Law, the New York Labor Law, the North Carolina Wage and Hour Act, and the Ohio Minimum Fair Wage Standards Act.  ECF No. 2.  On August 18, 2014, Plaintiffs filed their Second Amended Complaint in which they dropped their claims under the Nevada Wage and Hour Law following a motion to dismiss that was granted in part.  ECF No. 126.  On September 15, 2015, Plaintiffs filed their Third Amended Complaint, adding an additional nine (9) named Plaintiffs and adding claims under the South Carolina Payment of Wages Act and Massachusetts Minimum Wage Act.  ECF No. 357 ("Complaint"). The Third Amended Complaint is the operative complaint in this action.

In the Lawsuit, Plaintiffs asserted wage and hour claims under the FLSA, 29 U.S.C. § 201,

*et seq.* and various state laws, pertaining to hours of work, payment of wages, and overtime compensation. In the Complaint, named Plaintiffs brought claims on behalf of themselves and other similarly situated current and former non-franchise Outback Steakhouse restaurant hourly employees in the United States for the applicable statute of limitations periods, either as a nationwide collective action pursuant to 29 U.S.C. § 216(b), or as class actions pursuant to Fed. R. Civ. P. 23 for current and former hourly employees who worked in Illinois, Maryland, New York, North Carolina, Ohio, South Carolina, and Massachusetts.

On October 24, 2014, the Court granted Plaintiffs' Motion for Conditional Certification of Collective Action. ECF No. 151. On February 27, 2015, Plaintiffs sent Notice of Collective Action and Consent-to-Join forms to 135,338 current and former employees of Outback Steakhouse restaurants and an additional 4,141 notices on April 10, 2015, for a total of 139,469 notices. Declaration of Don Springmeyer ("Springmeyer Decl."), attached hereto as **Exhibit "A"** at ¶ 10. In response, 9,491 – or less than 7 percent – of current and former Outback employees from across the country to whom notices were sent chose to opt-in to this action ("Opt-in Plaintiffs"). *Id*.

Defendants denied Plaintiffs' allegations and asserted a number of affirmative defenses. For example, Defendants contend nearly half the named Plaintiffs admitted their minimum wage and overtime claims are without merit, citing the following evidence in support of this contention:

- Plaintiff Brown "concede[d] he does not have minimum wage claims."

- Plaintiff Cardoza stated under oath "I do not believe that I was paid less than the federal minimum wage."

- Plaintiffs Boharski, Brown, Cardoza, Connelley, Lassman, Murphy, Nesbitt, Talasko, and Verrengia admitted that they were paid in excess of "the applicable federal minimum wage per hour for all hours worked in the workweek."

- Plaintiffs Boharski, Brown, Cardoza, Connelley, Lassman, Loveall, Miller, Murphy, Talasko, and Zimmerman admitted that they "did not work any overtime at an Outback Steakhouse restaurant."

- Plaintiffs Hancock and Verrengia "clarified" that they "do not allege claims for violation of FLSA overtime provisions."

Of the 949 Collective Action Discovery Plaintiffs chosen for discovery, 419—representing 44.2%—did not respond in any manner to the written discovery (including Requests for Admission) after being given sixty days to respond.  Defendants contend that, by failing to respond, that group of individuals admitted they have no claims.  And of those who did respond to the written discovery, Defendants contend that numerous Collective Action Discovery Plaintiffs admitted in their written discovery responses that they did not work off-the-clock:[1]

- "I did not perform any work for which I was not paid." – Bowling Green, Kentucky hostess and busser, 2013.

- "I did not work off-the-clock." – Waikiki, Hawaii, hostess and busser, August 5, 2014 to December 10, 2014.

- "To my recollection, I have not worked off the clock during my employment with Outback." – Tulsa, Oklahoma, curbside takeaway and server, October 2011 to present.

- "I cannot [sic] any off the clock work at this time." – Matthews, North Carolina, hostess and server, July 2010 to April 2012.

- "I have not worked off-the-clock and I have not completed online training or in-store training without pay.  I have not attended meetings or events without pay." – Wisconsin, server, September 2014 to November 2014.

- "I have no claims to assert against each of the DEFENDANTS in this Action." – Ohio, busser, June 2011 to August 2012.

- "I have not worked off the clock at Outback."  – Pennsylvania, host and takeaway server, February 2002 to June 2006.

Defendants also denied the existence of any class-wide decision, policy or plan to require or allow Settlement Class Members to work off-the-clock.  Defendants contend the claims in the Action are amenable to neither class nor collective action treatment because there are too many variations and individualized issues presented within Plaintiffs' proposed class, which Defendants

---

[1]   Quotes below reference the location, position(s), and employment time period, but not the name, of referenced Collective Action Discovery Plaintiffs.

claim were borne out in written discovery responses from the Collective Action Discovery Plaintiffs.  Defendants cited to Plaintiffs the following evidence in support of their position that class or collective action treatment is not appropriate:

- At least 77.3% of Collective Action Discovery Plaintiffs admitted that "Outback Time" was not a term communicated to them by any manager of an Outback Steakhouse restaurant.

- At least 68.2% of Collective Action Discovery Plaintiffs admitted that they were aware that Defendants had a policy prohibiting off-the-clock work;

- At least 68.9% of Collective Action Discovery Plaintiffs admitted that they did not work enough hours in a week to reach the FLSA's overtime threshold;

- At least 82.4% of Collective Action Discovery Plaintiffs admitted that they did not work at any events (charitable, catering or marketing) sponsored by an Outback Steakhouse restaurant;

- At least 67% of Collective Action Discovery Plaintiffs admitted that their off-the-clock experiences differed by shift;

- At least 67.4% of Collective Action Discovery Plaintiffs admitted that their off-the-clock experiences differed by manager;

- At least 64.5% of Collective Action Discovery Plaintiffs admitted that their off-the-clock experiences differed by job duties;

- At least 61.8% of Collective Action Discovery Plaintiffs admitted that their off-the-clock experiences differed by job position; and,

- At least 54.5% of Collective Action Discovery Plaintiffs admitted that their off-the-clock experiences differed by location.

- At least 93.9% of Collective Action Discovery Plaintiffs admitted that they did not make any record of their off-the-clock work.

## A.   Class Counsel's Investigation

Class Counsel conducted an extensive investigation into the facts of the class action and the Named Plaintiffs and Settlement Class Members' claims, including through formal discovery,

1   informal disclosures between the parties, and other investigations undertaken by Class Counsel.

2   Springmeyer Decl. at ¶¶ 6-9. Furthermore, the parties engaged in extensive negotiations and

3   exchanged a copious amount of data, documents, and other information. *Id.*

4           Class Counsel collected detailed information and documents, where available, from

5   thousands of Class Members regarding hours worked by, and wages paid to, such Class Members.

6   *Id.* at ¶ 7.  Class Counsel thereafter interviewed hundreds of Class Members concerning their

7   claims. *Id.*  Class Counsel drafted and served hundreds of written discovery requests, which were

8   responded to by Defendants. *Id.*  In addition, Class Counsel reviewed and analyzed tens of

9   thousands of pages of documents produced by Defendants relating to Defendants' employment

10  practices and the hours worked by, and wages paid to, the Class Members. *Id.*  Class Counsel also

11  took depositions of several of Defendants' Managing Partners and Joint Venture Partners from

12  around the country, as well as several of Defendants' corporate-level employees. *Id.* at ¶ 8.  Class

13  Counsel retained a statistical expert to further review the information and documentation collected

14  from Class Members and from Defendants' documents and discovery responses. *Id.* at ¶ 9.  The

15  statistical expert's analysis of information and documentation assisted Class Counsel in assessing

16  the value of the Class Members' potential claims. *Id.* at ¶ 9.  This investigation provided Class

17  Counsel a more than adequate basis to reach an informed compromise.

18          Based on Class Counsel's investigation and evaluation of this case, Plaintiffs have

19  concluded that the settlement with Defendants as set forth in the Settlement Agreement is fair,

20  reasonable, and adequate and is in the best interest of the Settlement Class in light of all known

21  facts and circumstances, including the risk of significant delay, risk that the Action would not

22  proceed on a collective or class action basis, defenses asserted by Defendants, and numerous

23  potential appellate issues. *Id.* at ¶ 10.

24      **B.**      **The Mediation and Resultant Settlement**

25          On October 29, 2015, the parties participated in a mediation before Mark Rudy, a highly-

26  regarded mediator, with a specialty in wage-and-hour class actions. *Id.* at ¶ 3.  The parties were

27  unable to reach a settlement after the initial mediation session before Mr. Rudy.  Following the

28  initial mediation session, the parties continued their negotiations with Mr. Rudy's ongoing

assistance and, after several weeks of negotiations following the initial mediation session, the parties reached an agreement to settle the action on the terms set forth below.  *Id.*

### C.   Summary of the Key Terms of the Settlement

#### 1.   The Settlement Fund

The settlement creates a $3,000,000 fund (the "Settlement Fund").  ECF No. 419-1 at ¶ 2.5.A.  This fund is to be used to pay settlement payments to Settlement Class Members, discharge Defendants' obligation to pay attorneys' fees and costs under the FLSA, pay service awards to Named Plaintiffs and pay any employee and employer payroll taxes associated with the settlement payments.[2]  *Id.*  Under the settlement reached, administrative costs will not be paid from the Settlement Fund, but will instead be paid by Defendants over and above the Settlement Fund.  *Id.* at ¶ 2.6.A.  None of the $3 million settlement fund will revert to Defendants.  Under the terms of the Agreement, funds from uncashed checks will be paid to the appropriate state authorities.  *Id.* at ¶ 2.8.C.  As contemplated by the settlement, Class Counsel has filed a motion for attorneys' fees and costs, to be heard concurrently with this motion.

#### 2.   Calculation of Class Members' Individual Payments

Under the Settlement Agreement, each Participating Settlement Class Member (i.e. a Settlement Class Member who is a Named Plaintiff, an Opt-in Plaintiff, or who submitted a valid claim form) is to receive a pro-rata share of the Net Settlement Fund based on the number of hours recorded in the Participating Settlement Class Member's payroll records during the  applicable class period (which varies, depending on the state in which the employee worked) as a fraction of all hours recorded in Defendants' payroll records by all Settlement Class Members during the applicable class periods.  *Id.* at ¶ 2.7(B).  In addition, each Participating Class Member will be eligible to receive a pro rata share of at least 50% of the Residual Claim Benefit Fund – which is comprised of the unclaimed remainder of the Net Settlement Fund.[3]

---

[2]   This amount was negotiated based on the then-existing number of Class Members, and the settlement is conditioned upon the final class list being no greater than 5% of that amount.

[3]   Up to 50% of the Residual Benefit Fund will be distributed to Class Counsel in recognition of
(footnote continued)

### 3.     Settlement Administration and Notice

Rust Consulting serves as the Settlement Administrator.  Under the Settlement Agreement, Rust Consulting is responsible for all the negotiated class notice and claims administration functions, including: (i) compiling the class list from information provided by the parties; (ii) handling all mailings to the Settlement Class Members; (iii) tracing undeliverable mailings; (iv) recording and tracking responses to the mailing to the Settlement Class Members; (v) responding to inquiries made by the Settlement Class Members; (vi) calculating Gross and Net Individual Settlement Payments; (vii) issuing and mailing Settlement Payments; (viii) reporting payment of the Gross and Net Individual Settlement Payments to all required taxing and other authorities; (ix) making appropriate withholdings from the Gross Individual Settlement Payments; (x) remitting all Employee Payroll Taxes and Employer Payroll Taxes and other required payments withheld to the proper authorities; (xi) establishing a Qualified Settlement Fund ("QSF") pursuant to Section 468B(g) of the Internal Revenue Code, and regulations promulgated thereunder for the purpose of administering the Settlement; (xii) transmitting all Claim Forms from Participating Class Members to Plaintiffs' counsel; and (xiii) other related tasks as mutually agreed to by the parties.  *Id.* at ¶ 2.6.

In accordance with the Settlement Agreement, and as approved by the Court, the Settlement Administrator compiled the class list from information provided by the parties and sent the approved class notice to 166,786 identified Class Members on or about June 8, 2016. *See* Declaration of Amanda Myette, attached hereto as **Exhibit "B"** at ¶ 10. Of the 166,786 notices that were sent, 24,794 were returned as undeliverable with no forwarding address. *Id.* at ¶ 11. The Settlement Administrator then attempted to trace and re-send notices to those with bad addresses. *See id.* at ¶¶ 11-12. Of the 166,786 notices mailed, the Settlement Administrator received a total of 10,707 claim forms prior to the deadline. *Id.* at ¶ 13. The Settlement Administrator also received 44 claim forms from Class Members seeking to assert claims whose claims forms were

---

their agreement not to seek their full lodestar in their request for attorneys' fees.  *Id.* at ¶ 2.7.B.(iii)(i).

postmarked after the deadline. *Id.*

### 4.   The Positive Response to the Settlement Agreement

The class notice notified Class Members of the Settlement Agreement and the opportunity to participate in the settlement. A total of 18,091 current or former Outback employees submitted timely claim forms, or were otherwise included as Class Members under the terms of the Settlement Agreement.[4] *See id.* at ¶ 14. Only 26 of the 166,786 Class Members, or .015 percent of the class, sought to be excluded from the class. *See id.* at ¶ 115.  Tellingly, there was not a single objection from the 166,786 Class Members to the proposed settlement. *See id.* at ¶ 15.

## III.   FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE [5]

The law strongly favors settlements, particularly where complex class action litigation is concerned. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Settlement of a class action, however, is subject to the court's approval.  Fed. R. Civ. P. 23(e).  Similarly, FLSA class action claims may be settled under the supervision of the Department of Labor or with court approval. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352-53 (11th Cir. 1982). When the parties to a putative class action reach a settlement agreement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

Court approval of a class action settlement follows a three-step procedure: "(1) preliminary approval of the proposed settlement at an informal hearing; (2) dissemination of mailed … or

---

[4]   After the deadline for filing claims, the Settlement Administrator received forty-four (44) additional claim forms from Class Members. After consultation, Plaintiffs and Defendants have stipulated, with Court approval, that Class Members whose claim forms were untimely, but received on or before October 7, 2016 will be eligible to participate in the Settlement. A stipulation and order for the Court's review and approval is being filed concurrently herewith.

[5]   Defendants do not necessarily agree with the positions taken by Plaintiffs in this brief or concede the merits of Plaintiffs' claims; however, Defendants do not oppose Plaintiffs' request for final approval of the settlement and do not oppose final certification of the Settlement Class solely for the purpose of settlement of this lawsuit, subject to the conditions set forth in the Settlement Agreement.

1   published notice of the settlement to all affected Class Members; and (3) a 'formal fairness

2   hearing' or final settlement approval hearing, at which Class Members may be heard regarding the

3   settlement, and at which evidence and argument concerning the fairness, adequacy, and

4   reasonableness of the settlement may be presented." *Harris v. U.S. Physical Therapy, Inc.*, 2012

5   WL 3277278, at *3 (D. Nev. July 18, 2012), *report and recommendation adopted*, 2012 WL

6   3277276 (D. Nev. Aug. 9, 2012) (quoting Manual for Complex Litigation (Fourth) § 21.632

7   (2008)).

8          The first two steps of the class settlement approval process – preliminary approval and

9   mailing of notice – have been completed. The final step for the Court is now the final settlement

10  hearing to determine the fairness, adequacy, and reasonableness of the settlement. *Harris*, 2012

11  WL 3277278, at *3. As detailed below, the settlement was fair, adequate, and reasonable and

12  achieved the best result possible for the Class. Accordingly, the Court should enter an order of

13  final approval of the settlement.

14         A.      **The Settlement Was the Result of Non-Collusive, Arm's-Length, Informed**

15                 **Negotiations**

16         The parties settled this case after over two years of heavily contested litigation, and only

17  after extensive, arms-length negotiations that occurred during mediation under the supervision of

18  Mark Rudy, an experienced and well regarded mediator, followed by several weeks of negotiation,

19  in which the mediator remained involved.  Springmeyer Decl. at ¶ 3.  Plaintiffs were represented

20  by four experienced class action firms and Defendants were represented by equally experienced

21  defense firm, including Gibson Dunn.  By the time of the initial mediation, Class Counsel had

22  thoroughly researched the applicable law on the FLSA claims, the class certification law, and the

23  state laws on both merits (state wage and hour law) and state class certification.  *Id*. at ¶ 5.  They

24  had diligently investigated the facts and interviewed hundreds of Opt-in Plaintiffs.  *Id.* at ¶ 6.

25  They had briefed a motion to dismiss, as well as a Motion for Conditional Class Certification.  *Id.*

26         Class Counsel also collected detailed information and documents, where available, from

27  thousands of Class Members regarding hours worked by, and wages paid to, such Class Members.

28  *Id.* at ¶ 7.  Class Counsel thereafter interviewed hundreds of the Class Members concerning their

1   claims.  *Id.*  Class Counsel drafted and served hundreds of written discovery requests, which were

2   responded to by Defendants.  *Id.*  In addition, Class Counsel reviewed and analyzed tens of

3   thousands of pages of documents produced by Defendants relating to Defendants' employment

4   practices and the hours worked by, and wages paid to, members of the class.  *Id.*  Class Counsel

5   also took the depositions of several of Defendants' Managing Partners and Joint Venture Partners

6   from around the country, as well as several of Defendants' corporate-level employees.  *Id.* at ¶ 8.

7   Class Counsel retained a statistical expert to further review the information and documentation

8   collected from Class Members and from Defendants' documents and discovery responses.  *Id.* at

9   ¶ 9.  The statistical expert's analysis of information and documentation assisted Class Counsel in

10  assessing the value of potential claims by the class.  *Id.* at ¶ 9.  This investigation provided Class

11  Counsel a more than adequate basis to reach an informed compromise.

12       Accordingly, the process by which the parties reached the settlement weighs in favor of

13  preliminary approval.  *See Nen Thio*, 14 F. Supp. 3d at 1334 (settlement reached with assistance of

14  experienced class action mediator after review of payroll data weighed in favor of preliminary

15  approval); *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21,

16  2012) (settlement reached with assistance of experienced mediator after review of data

17  demonstrates lack of collusion).[6]

18       **B.       The Proposed Settlement Has No Obvious Deficiencies**

19       Here, the settlement has no obvious deficiencies or signs of collusion.  Rather, Defendants

20  have agreed to pay $3,000,000, a substantial sum of money, in settlement of the claims asserted.

21  No particular group of Class Members is left out or treated unfavorably.  No new claims are being

22  added to the settlement after it was negotiated.  There is no reversion or clear-sailing provision on

23  fees.[7]  The claim form serves the legitimate purpose of identifying class members with off-the-

---

[6]    The Settlement also lacks other "subtle signs" of collusion that warrant caution. *See In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

[7]    *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d at 948-49 (recognizing "clear sailing" provisions are not prohibited but require court to be "careful to avoid awarding 'unreasonably high' fees simply because they are uncontested").

clock time, wishing to pursue their claim and exercise their opt in rights.[8] And Class Counsel

agreed to waive requesting their full lodestar; rather, Class Counsel agreed to provide Settlement

Class Members with the first preference to claim otherwise unclaimed settlement funds.[9] So, after

payment of attorney's fees and certain other costs, all of the settlement funds will be distributed to

the Settlement Class Members who submit timely and valid claims – the very people who are most

likely to have been significantly damaged by the alleged misconduct and who would likely have

come forward if trial was required.

In exchange for this consideration, Defendants will receive releases from all Settlement

Class Members who did not exclude themselves from the Settlement.  The scope of the releases is

not unlimited, but extends only to claims based on the facts alleged or which could have been

alleged in this Action.

Accordingly, there are no obvious deficiencies precluding preliminary approval of the

settlement.  *See Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 324-25 (N.D. Cal. 2013) (finding no

obvious deficiencies where "the settlement confers tangible monetary benefits to the class—

namely, a gross settlement amount of $800,000[,] [t]here is no indication that the proposed

settlement improperly grants preferential treatment to class representatives or segments of the

class[, and] [t]he methodology agreed to by the parties for allocating the Net Settlement Fund

appears fair and reasonable."); *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 302 (E.D.

Cal. 2011) (finding no obvious deficiencies where settlement provides for $150,000 payment,

entire settlement payment is distributed to Class Members who make timely claims, and

settlement payments to be determined based on number of weeks worked by each class member);

*Nen Thio*, 14 F. Supp. 3d at 1334 (settlement had no obvious deficiencies where the scope of the

release, while broad, "is acceptable because the claims released are limited to those based upon the

facts set forth in the First Amended Complaint"); *Custom LED, LLC v. eBay, Inc.*, 2013 WL

---

[8]  *Millan v. Cascade Water Servs.*, 310 F.R.D. 593 (E.D. Cal. 2015).

[9]  As discussed below, the amount of the Settlement Fund allocated for attorneys' fees and costs does not constitute a disproportionate distribution to Class Counsel.

6114379, at *4, *7 (N.D. Cal. Nov. 20, 2013) (scope of release in class action settlement was not improperly broad where it released all claims, "known or unknown," "arising out of or relating in any way to any of the legal, factual, or other allegations made in the Action, or any legal theories that could have been raised based on the allegations of the Action").

### C.   The Proposed Settlement Does Not Improperly Grant Preferential Treatment to Class Representatives or Segments of the Class

The relief provided in the settlement will benefit all Class Members equally.  The settlement does not improperly grant preferential treatment to the Named Plaintiffs or any other segments of the Class.

Each Settlement Class Member, including the Named Plaintiffs, who have worked hours as an hourly employee during the applicable period are entitled to payment based on the plan of allocation.  Each Participating Settlement Class Member's lump sum payment will be determined through the application of a formula, which will ensure that the settlement proceeds are distributed to the Class Members on a pro rata basis, based on the number of workweeks during the applicable class period in which they worked.  Accordingly, the settlement does not unfairly give preferential treatment to any segments of the class.  *See Tijero*, 301 F.R.D. at 324-25 (preliminary approval to settlement granted where, among other things, "[t]here is no indication that the proposed settlement improperly grants preferential treatment to class representatives or segments of the class[, and] [t]he methodology agreed to by the parties for allocating the Net Settlement Fund appears fair and reasonable").

### D.   The Proposed Settlement Falls Well Within the Range of Possible Approval

"To determine whether a settlement 'falls within the range of possible approval' a court must focus on 'substantive fairness and adequacy,' and 'consider plaintiffs' expected recovery balanced against the value of the settlement offer.'"  *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 623 (citing and quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)).  A settlement falls within the reasonable range of approval even where it does not realize the maximum recovery for the Plaintiffs.  Indeed, "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes."  *Vasquez v. Coast*

*Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (citing and quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

In determining whether a settlement falls within the reasonable range of approval, the risks of proceeding with the litigation rather than settling is always taken into account.  *See, e.g., Tijero*, 301 F.R.D. at 324 (preliminarily approving settlement agreement in wage and hour action, explaining that "based on its experience with similar actions, the Court finds that the settlement amount of $800,000 preliminarily appears to be fair, reasonable, and adequate in light of the 'maximum damage exposure' calculated by Plaintiffs and the risks and costs attendant with further litigation").  "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.'" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000) (citing and quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982)).  In fact, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 427 (S.D.N.Y. 1993).  In *Rubio-Delgado v. Aerotek, Inc.*, 2015 WL 3623627, at *9 (N.D. Cal. June 10, 2015), the Court explained that "[w]hether a settlement that is between 0.67 percent and 6.7 percent of the expected recovery is within the range of possible approval depends on the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the extent of discovery completed and the stage of the proceedings; and the experience and views of counsel." Under the facts of this case, the settlement falls well within the range of possible approval, particularly when taking the substantial risks of continuing with this litigation into account.

Plaintiffs are confident that they would have been able to maintain a class action for some or all of the claims asserted, and in particular, claims for off-the-clock work relating to mandatory online training for Outback employees. Discovery conducted prior to settlement confirmed that Outback mandated training through its BBI University online portal and that the vast majority of employees were not paid for their time in completing such training. While Plaintiffs believe their

14

claims were properly asserted, "there is always risk inherent in a jury trial and that risk cannot be discounted." *Hester v. Vision Airlines, Inc.*, 2014 WL 1366550, at *4 (D. Nev. Apr. 7, 2014). Moreover, Defendants ardently denied liability and intensively litigated nearly every aspect of this Action, an approach that could frustrate Plaintiffs' ability to recover the full damages they seek and protract this litigation.  In this regard, Defendants pointed to the purported admissions of various Class Members obtained during discovery in which such Class Members stated they were not paid less than the federal minimum wage and that they did not work off-the-clock.  In addition, although Defendants identified more than 140,000 employees to whom notice of preliminary approval was originally sent in 2015, less than seven percent (7%), or 9,491, actually submitted consent forms.  Springmeyer Decl. at ¶ 10.  Of the 9,491, less than half were responsive to requests by Class Counsel for additional information concerning their alleged claims and, of those who did respond, several could not identify any off-the-clock or overtime work.  *Id.*  The relatively small number of employees who took action to assert and support their claims influenced the amount Defendants were willing to offer towards settlement.  *Id.*

Additionally, while Plaintiffs believe that collective and class action treatment is appropriate in this case, Defendants will strenuously argue that class or collective action treatment is not appropriate here, contending there are too many variations and individualized issues presented within Plaintiffs' proposed class.  *Id.* at ¶ 11.  In support of their contentions, Defendants point to the discovery responses of the Collective Action Discovery Plaintiffs set forth in section II.B., above, which appears to suggest that relatively large numbers of Class Members admitted, among other things, that: "Outback Time" was not a term communicated to them by any manager of an Outback Steakhouse restaurant; they were aware that Defendants had a policy prohibiting off-the-clock work; they did not work enough hours in a week to reach the FLSA's overtime threshold; they did not work at any events (charitable, catering or marketing) sponsored by an Outback Steakhouse restaurant; their off-the-clock experiences differed by shift; their off-the-clock experiences differed by manager; their off-the-clock experiences differed by job duties; their off-the-clock experiences differed by job position; their off-the-clock experiences differed by location; and, they did not make any record of their off-the-clock work.  *Id.*  Obviously this

evidence pointed to by Defendants creates significant obstacles to Plaintiffs' ability to avoid

decertification of the collective action and to obtain class certification in this case.

Plaintiffs acknowledge that in several recent large FLSA collective actions, courts

decertified collective actions due to disparate factual and employment settings of collective action

plaintiffs and disparate affirmative defenses. *See, e.g., Mathis v. Darden Restaurants*, 2014 WL

4428171, at *6 (S.D. Fla. Sept. 1, 2014) (decertifying FLSA collective action brought by

employees of Darden restaurant chains); *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 630-

33 (S.D. Cal. 2014) (decertifying FLSA collective action and Rule 23 class action).

If the Court decertified the collective action and declined to certify state-level classes, then

most absent Class Members would lose their best opportunity to recover damages from

Defendants.  Settlement, on the other hand, eliminates any risk that the FLSA collective action

would be decertified or that Plaintiffs would be unsuccessful in certifying state-based classes and

maintaining certification through trial. *See, e.g., Harris*, 2012 WL 3277278, at *6 (risk that class

certification motion could be denied weighed in favor of preliminary approval); *Vanwagoner v.*

*Siemens Indus., Inc.*, 2014 WL 7273642, at *6 (E.D. Cal. Dec. 17, 2014) (same).

In analyzing their claims through the discovery process, Plaintiffs determined that while

individuals may have viable claims for pre- and post-shift off-the-clock work, unpaid meetings,

etc., the only claim that would likely survive a motion for decertification or a motion for class

certification would be a claim based upon unpaid online training, as this claim suffers from less

variance from employee-to-employee, store-to-store, and manager-to-manager. Based on

Plaintiffs' analysis of data received from Class Members, Plaintiffs, with assistance from their

expert consultant, calculated that during the applicable time frame, Outback employees completed

an average of 11.9 hours of online training.  Springmeyer Decl. at ¶ 12.  Thus, extrapolating the

average hours of online training at $7.25, the total potential damages that might be awarded is

$12.4 million.[10] The settlement agreement requires Defendants to pay $3 million, which is more

_____

[10]   Plaintiffs' estimate assumes that all Class Members were uncompensated for online training.
While the majority of Class Members reported not being paid for online training, Defendants' pay
(footnote continued)

than 24% of this total amount (*id.*), well within the range of possible approval indicated in the relevant case authority. [11]

While the potential recovery if Plaintiffs had prevailed could have been larger than the proposed settlement amount, based on the inherent uncertainty of a jury trial, the uncertainty of collective action decertification, proposed class certification of several state-level classes, and other obstacles to establishing liability on Plaintiffs' claims, the proposed settlement is well within the range of approval and should be finally approved. *See Hanlon*, 150 F.3d at 1027 (reviewing court should defer to "the private consensual decision of the parties" familiar with the case regarding appropriateness of settlement); *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (fairness hearing should not be turned into a "rehearsal for trial on the merits" but should assess whether settlement taken as a whole is fair, reasonable, and adequate); *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting 5 *Moore's Federal Practice,* § 23.85[2][b] (Matthew Bender 3d ed. 1997)) ("proposed settlement is not to be judged against a speculative measure of what might have been awarded in a judgment in favor of the class").

### E.   The *City of Seattle* Factors Support Final Approval

In addition, when determining whether a class settlement ultimately is fair – at the final settlement approval hearing – courts examine the following factors: (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the Class Members to the proposed settlement. *See City of Seattle*, 955 F.2d at 1291; *Hanlon*, 150 F.3d at 1026

---

records reflect that some Class Members who believed they were not paid for online training were paid for some or all of the time spent on online training, further complicating Plaintiffs' ability to recover on behalf of the Class.

[11]   On an individual basis, as further discussed below, the 18,091 Class Members stand to receive an average of $30.56. At $7.25 per hour, this amount equates to 4.2 hours.

1   (citations omitted). "Courts have, at times, engaged in a 'preliminary evaluation' of these factors

2   to determine whether a settlement is fair, adequate, and reasonable." *Hester*, 2014 WL 1366550, at

3   *3.

4          1.    The Parties Dispute the Strength Of Plaintiffs' Claims and Whether the

5               Claims Can Be Certified Under Rule 23.

6        As discussed above, Plaintiffs believe that their claims are strong and that they would

7   succeed both in establishing class or collective treatment of these claims and on the merits of these

8   claims.  Nevertheless, there is a real risk that Plaintiffs could fail to obtain class or collective

9   treatment of this case and that Plaintiffs would not prevail on the merits.  Defendants for example,

10  would contest similarly situated and predominance standards under the FLSA and Rule 23, as well

11  as state law companion class action rules.  This is an off-the-clock case.  Thus, at the heart of

12  Defendants' argument would be the fact that each class member worked different shifts, at

13  different locations, under different managers, and were given different instructions.  Whether a

14  common policy and common evidence would prevail is "up in the air" at best.

15       If the Court declined to certify the class, then most absent Class Members would lose their

16  best opportunity to recover from Defendants.  Opt-in Plaintiffs would have to continue to

17  participate in the litigation and go to trial.  Settlement, on the other hand, eliminates any risk that

18  Plaintiffs would face decertification of the collective action, not successfully obtain certification of

19  various state-based classes, and maintain collective action and class certification through trial.

20       In light of these risks, the proposed settlement is advantageous for the Class and should be

21  finally approved.

22         2.    Further Litigation Will Be Extensive and Complex and Cause the Parties to

23              Incur Significant Risk and Expense.

24       Throughout the previous two years of litigation, this nationwide case has proven to be

25  complex, expensive, and time-consuming. Unless the settlement is approved, it is likely the parties

26  will continue to vigorously litigate the case, which – despite its years and the significant

27  investment of time by counsel on both sides – is only at the outset of discovery. *See Hester*, 2014

28  WL 1366550, at *4 (years of litigation and an appeal, among other things, suggested parties would

continue to litigate for years absent settlement). Litigation of the parties' claims could involve hundreds of depositions throughout the United States, briefing class certification, briefing dispositive motions, and preparing for and conducting trial. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) ("serious hurdles" remaining such as defendant's anticipated motion for summary judgment and appeals that would prolong litigation and recovery by Class Members, favored settlement). In light of the substantial additional expense the parties will incur if litigation proceeds, final approval of the settlement is warranted.

         3.     <u>The Amount Offered in Settlement Will Fairly and Adequately Compensate Class Members</u>

As discussed above, the $3 million which Defendants have agreed to pay in settlement of this case fairly and adequately compensates Class Members.  The value of this settlement is enhanced due to the barriers Class Members would face if they attempted to pursue their claims on an individual basis. Damages would be measured in minutes, and in limited cases, hours per week for people who earn in most instances just above the minimum wage.  Given their relatively low individual damages, it would be uneconomical for Class Members to litigate individually. *See Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001), *cert. denied*, 534 U.S. 973 (2001) ("*Local Joint Exec. Bd.*") (recognizing class treatment is preferable where there is disparity between litigation costs and damages).

As previously described, the Settlement Agreement approved by this Court contains a two-step approach to calculating settlement funds that will go to Class Members who returned claim forms and/or were otherwise included as Class Members. Each Class Member will receive the "Hours Claim Benefit," which is a pro-rata share of the Net Settlement Fund based on the number of hours recorded in the Participating Settlement Class Member's payroll records during the applicable class period (which varies, depending on the state in which the employee worked) as a fraction of all hours recorded in Defendants' payroll records by all Settlement Class Members during the applicable class periods.  ECF No. 419-1 at ¶ 2.7(B).  Necessarily, under the formula, those employees who have worked more hours during the Applicable Period, as defined in the Settlement Agreement, would receive a greater share of the Net Settlement Fund than employees

who worked less hours.  Several states have longer statutes of limitation periods for unpaid wage claims, such as Illinois, thus Class Members in those states have the opportunity to receive a larger share of the Net Settlement Fund. In short, the Hours Claim Benefit is the amount that each Class Member would have received if all Class Members submitted claims forms. Based upon the number of Class Members who are eligible to receive a portion of the Net Settlement Fund, the Hours Claim Benefit totals $162,071.72. Myette Decl., Ex. B, at ¶ 18.

In addition, each Class Member who has a claim will receive a pro rata share of at least 50% of the Residual Claim Benefit Fund – which is comprised of the remainder of the Net Settlement Fund that is not claimed by Class Members.  That Fund represents unused settlement benefit funds that were originally negotiated to pay class members before the claims period closed, plus fees not included in the initial $1.5 million fee allocation. In essence, the Class Member portion of the Residual Clam Benefit Fund is a pour-over benefit of monies not needed to compensate a larger participation rate  as a result of other Class Members' failure to submit claim forms. The total pour over for  Class Members who submitted claim forms under the Residual Claim Benefit Fund is $390,710.54. *Id.* at ¶ 18.

It is difficult to apply an average anticipated award to Class Members, as the number of hours worked during the Applicable Time Period varies widely, from 1 hour to 23,783.6 hours. *Id.* at ¶ 19. With that caveat, the 18,091 Class Members stand to receive an average of $30.56, which at $7.25 per hour equates to 4.2 hours. For those who worked more hours, the amount is substantially more, up to the equivalent of 53 hours at $7.25 per hour. *Id.* at ¶ 20.

Plaintiffs' strongest claim, and the one most likely to survive an anticipated motion for decertification if litigation had proceeded, related to uncompensated online training through BBI University. Based upon the information available through discovery, employees surveyed took approximately two to 2.5 hours of online training courses per year. Springmeyer Decl., Ex. A, at ¶ 13. Thus, *on average*, Class Members stand to receive compensation for approximately two years' worth of unpaid training time. All things considered, Plaintiffs' counsel believe that recovering an average of two years' worth of pay for Class Members' likely claims is a substantial victory. Accordingly, the amount offered in the settlement, as well as its proposed allocation,

1    weighs strongly in favor of final approval.

2            4.      Plaintiffs Have Conducted Sufficient Discovery and Investigation to Assess

3                    Settlement

4            Plaintiffs agreed to settle this case only after more than two years of litigation and

5    extensive discovery and investigation.  Class Counsel's combined lodestar is itself approaching $3

6    million and not a penny of that was wasted time or effort.  Interviews with Class Members

7    confirmed many of the challenges inherent in pursuing these claims and maintaining them as

8    collective and class actions.  As a result, Plaintiffs and Class Counsel "had access to sufficient

9    information to adequately evaluate the merits of the case and weigh the benefits of settlement

10   against further litigation." *Hester*, 2014 WL 1366550, at *5.

11           5.      In Light of Their Experience and Knowledge of the Case, Class Counsel

12                   Believes the Settlement is Reasonable, Fair, and Adequate

13           "Great weight is accorded to the recommendation of counsel, who are most closely

14   acquainted with the facts of the underlying litigation," *Nat'l Rural Telecommunications Coop.*,

15   221 F.R.D. at 528 (C.D. Cal. 2004) (citations and internal quotations omitted), and here Class

16   Counsel believes the settlement is fair, reasonable, and adequate in light of the circumstances of

17   the case. Springmeyer Decl. at ¶ 10.  Class Counsel are experienced wage and hour class action

18   litigators. *Id.* at ¶¶ 14-17.  While Class Counsel believe that Plaintiffs' claims are meritorious, they

19   understand the outcome of decertification, state-based class certification, dispositive motions, trial,

20   and potential additional appeals are inherently uncertain.  *Id.* at ¶¶ 10-12.  Moreover, if this

21   litigation continues, it may be years before Class Members receive any recovery.  *Id.*  This

22   settlement will allow Class Members to promptly recover money to compensate them for any

23   minimum wage violations and uncompensated off-the-clock work they performed.  Class Counsel

24   believe this is a very good outcome given the risks and delays in pressing forward.  *See Rodriguez*

25   *v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("[p]arties represented by competent

26   counsel are better positioned than courts to produce a settlement that fairly reflects each party's

27   expected outcome in litigation") (citations and internal quotations omitted).

28

6.    Class Members Informed of the Settlement Have Reacted Positively

Class Members informed of the settlement have overwhelmingly reacted positively to the proposed settlement. Class Counsel initially explained the material terms of settlement to the twenty-one (21) active Named Plaintiffs, who gave their unanimous approval to the settlement. Springmeyer Decl. at ¶ 10.  After preliminary approval, notice was sent to 166,786 identified Class Members. *See* Myette Decl., Ex. B, at ¶ 10. Only 26 of the 166,786 Class Members, or .015 percent of the class, sought to be excluded from the class and not a single one of the 166,786 Class Members timely objected to the proposed settlement. *See id.* at ¶¶ 14-15. In light of the positive reaction to the settlement, final approval should be granted.

**IV.    THE COURT SHOULD APPROVE THE REQUESTED SERVICE AWARDS**

The Settlement Agreement here contemplates class representatives who are no longer employed by Defendants each receiving service awards in the amount of $5,000 and class representatives who remain employed by Defendants each receiving service awards in the amount of  $2,500, both subject to the Court's approval.[12]

"[I]t is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 470 (C.D. Cal. 2014).  In fact, "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provide and the risks they incurred during the course of the class action litigation." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 490 (E.D. Cal. 2010) (citing and quoting *Ingram v. The Coca–Cola Co.,* 200 F.R.D. 685, 694 (N.D. Ga.2001)).

"Whether to authorize an incentive payment to a class representative is a matter within the court's discretion." *Id.*  The criteria courts consider in determining whether to approve an

---

[12]   The reason for the difference in the amounts of incentive awards is that class representatives who are no longer employed by Defendants have agreed not to seek employments with Defendants in the future, while those who are still employed by Defendants are permitted to continue in their employment.

incentive award include: "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation[;] and[ ] 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Id.* (citing and quoting *Van Vranken v. Atlantic Richfield Co.,* 901 F. Supp. 294, 299 (N.D.Cal.1995)).  Each of these factors support the approval of the requested class representative incentive awards here.

First, in agreeing to become named Plaintiffs, Plaintiffs undertook the financial risk of becoming liable for Defendants' costs in the event of a defense victory in this case.  *See Vasquez*, *supra*, at 491 (approving incentive awards to named plaintiffs of $5,000, recognizing that Plaintiffs "undertook the financial risk that, in the event of a judgment in favor of Defendant[s] in this action, they could have been personally responsible for any costs awarded in favor of Defendant[s].")  Plaintiffs also assumed the risk of potential stigma and reprisal for bringing this action, either in their continued employment with Defendants or in connection with future employment.  *See Campbell v. First Investors Corp.*, 2012 WL 5373423, at *8 (S.D. Cal. Oct. 29, 2012) (court preliminary approves incentive award sought by Plaintiff to compensate her for "for her time, effort, risks undertaken for the payment of costs in the event this action had been unsuccessful, and stigma upon future employment opportunities for having initiated an action against a former employer").

The other factors also support approval of the class representative service awards.  Over the two-year period during which this litigation has been pending, the named Plaintiffs spent considerable time and effort in connection with this litigation, including meeting with Class Counsel, providing documents and discovery responses, assisting Class Counsel in their investigation, and sitting for depositions.  The class representatives have received no personal benefit as a result of their efforts on behalf of the class, to date.  The incentive awards contemplated by the settlement ($5,000 for class representatives no longer employed by Defendants and $2,500 for class representatives who remain employed by Defendants) would be their sole compensation for this service, above and beyond whatever payments they are entitled to

as Class Members.

In *In re Toys R Us-Delaware, Inc.*, the Court approved class representative service awards of $5,000 to each named plaintiff, noting that "[t]hese proposed awards are consistent with the amount courts typically award as incentive payments." *Id.* (citing *In re Mego Financial Corp.*, 213 F.3d at 463) (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC*, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.*, 2011 WL 320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named plaintiffs); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646–47 (S.D. Cal. 2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.*, 2010 WL 4285011, *3 (S.D. Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking*, 2006 WL 3020943, *10 (E.D. Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named plaintiff).

As such, the service awards requested by Plaintiffs ($5,000 for class representatives no longer employed by Defendants and $2,500 for class representatives who remain employed by Defendants) is well within the range of what is presumptively reasonable, are supported by the facts, and should thus be awarded as requested.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V.   <u>CONCLUSION</u>

In the judgment of Plaintiffs and Class Counsel, the proposed settlement is a fair and reasonable compromise of the issues in dispute in light of the strengths and weaknesses of each party's case.  Accordingly, Plaintiffs respectfully request that the Court grant final approval to the proposed settlement and enter the proposed Final Approval Order and Judgment submitted herewith.

DATED this 11th day of October, 2016.

**WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN, LLP**

By:   *Don Springmeyer, Esq.*
Don Springmeyer, Esq.
Nevada State Bar No. 1021
Justin C. Jones, Esq.
Nevada State Bar No. 8519
Bradley Schrager, Esq.
Nevada State Bar No. 10217
3556 E. Russell Road, Second Floor
Las Vegas, Nevada 89120

Timothy J. Becker, Esq. (admitted pro hac)
Jacob Rusch, Esq. (admitted pro hac)
JOHNSON BECKER, PLLC
33 S. Sixth Street, Suite 4530
Minneapolis, Minnesota 55402

Jason J. Thompson, Esq. (admitted pro hac)
Jesse Young, Esq. (admitted pro hac)
SOMMERS SCHWARTZ, P.C.
2000 Town Center, Suite 900
Southfield, Michigan  48075

William F. Cash III, Esq. (admitted pro hac)
Brandon L. Bogle, Esq. (admitted pro hac)
LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY, & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502

*Attorneys for Plaintiffs and Interim Class Counsel*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of October, 2016, a true and correct copy

of **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF FLSA CLASS SETTLEMENT**

was served via the United States District Court CM/ECF system on all parties or persons requiring

notice.

By   */s/ Christie Rehfeld*
               Christie Rehfeld, an Employee of
               WOLF, RIFKIN, SHAPIRO, SCHULMAN &
               RABKIN, LLP